**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WHITE THORNE CAPITAL, LLC f/k/a MCGRAW CAPITAL PARTNERS, LLC, | ) )<br>)<br>) |
| Plaintiff, | ) |
| | ) **No.** |
| -v- | )<br>) |
| | ) |
| SAFE HARVEST MEDICAL, | ) |
| | ) |
| and | ) |
| | ) |
| GARRETT MANN and JASON TOMLINSON, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, White Thorne Capital, LLC f/k/a McGraw Capital, LLC by and through its attorneys, Cozen O'Connor, brings this Complaint against Defendants Safe Harvest Medical, LLC, Garrett Mann, and Jason Tomlinson and states as follows:

## THE PARTIES

1.     Plaintiff, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC (hereinafter referred to as "Plaintiff" or "McGraw"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Illinois Street, Suite 200, St. Charles, IL 60174 and at all times material herein, was and is in the business of purchasing their accounts receivables.

2.     Defendant, Safe Harvest Medical, LLC (hereinafter "SHM") is a limited liability company organized and existing under the laws of Wyoming, with a principal place of business

located at 201 East 5ᵗʰ St, Ste. 1200, Sheridan, WY 82801 and at all times material herein, was in the business of brokering deals involving personal protective equipment and supplies.

3.      McGraw alleges that (a) Defendant, Garrett Mann is an individual domiciled in, and a citizen of, the State of Texas; and (b) Mann is the chief executive officer of Safe Harvest Medical, LLC (hereinafter "SHM"), a limited liability company which at all times material herein, was in the business of brokering deals involving personal protective equipment and supplies.

4.      McGraw alleges that (a) Defendant, Jason Tomlinson is an individual domiciled in, and a citizen of, the State of South Carolina; (b) and Tomlinson was the vice president of SHM.

## JURISDICTION AND VENUE

5.      Jurisdiction of this action is conferred upon the Court by 28 U.S. Code § 1332(a)(1) as the matter in controversy exceeds the sum of $75,000 and is between citizens of different States.

6.      Jurisdiction and venue are also proper before this Court as the Parties contracted for and consented to Jurisdiction in any state or federal court within the State of Illinois:

> Any legal action, suit or proceeding arising from the Merchant Invoice Purchase Agreement or this Fraud Guaranty, or the transactions contemplated hereby or thereby, may be instituted in any state or federal court of competent subject matter jurisdiction in the State of Illinois. The Guarantor(s) hereby knowingly and voluntarily consent to personal jurisdiction in the courts of the State of Illinois with respect to any such legal action, suit or proceeding. The Guarantor(s) hereby irrevocably consent to the service of process in any of the aforementioned courts in any such action, suit or proceeding by certified US Mail, postage prepaid, to him/her/them at the address(es) set forth below. The Guarantor(s) knowingly and voluntarily waive any claim or defense in any action, suit or proceeding commenced in the Illinois State Court or the United States District Court for the District of Northern Illinois, asserting that he/she/they is/are not subject personally to the jurisdiction of such court, that service upon him/her/them as hereinabove set forth is invalid, that his/her/their property is immune or exempt form attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that the Merchant Cash Advance Agreement or this Fraud Guaranty, or the subject matter hereof, may not be enforced in or by such court.

(Exs. A –D) (highlight added).

## FACTUAL ALLEGATIONS

7.      Defendants SHM, Mann, and Tomlinson each took advantage of McGraw by fraudulently misrepresenting that they were fulfilling orders for medical gloves and that inventory would give rise to the Receivables ("Inventory"). Once the sale was complete, SHM claimed that they could return, at the very least, McGraw's funds.

8.      Defendants SHM, Mann, and Tomlinson have wrongfully pocketed millions of dollars of McGraw's funds and have refused to devote their resources to meet their contractual obligations and repay McGraw for what Defendants have agreed is due and owing.

9.      SHM, via Mann and Tomlinson, posted an investment summary seeking a funding partner for the acquisition of hospital grade surgical gloves overseas to address US demand of its distribution contacts, with whom SHM stated they had access to, in many cases, as existing customers.

10.      SHM  maintained that its distribution contacts, which included numerous hospital systems (227 hospitals besides surgery centers and clinics), the Veterans Administration and other government agencies such as FEMA, required surgical gloves, as demand has been heightened by the COVID-19 health pandemic. SHM asserted it had relationships with both suppliers and end users.

11.      SHM claimed it was uniquely positioned to fulfill three of the four components of transacting in this space: supply comes from overseas factories with allocations that included the TDK brand and Deusberg 4mm nitrile gloves, plus the critical logistics experience to make the transaction as smooth as possible.

12.      SHM claimed that it had 80 years of international sourcing, importing and logistics experience.

13.     SHM likewise claimed it was able to satisfy bona fide demand from hospital and government systems for up to five million boxes of gloves per week, or any portion thereof, if financing was available.

14.     SHM sought a financial partner to fund overseas production at around $9 per box.

15.     SHM foresaw "rolling orders" of around 500,000 – 1M boxes per week.

16.     By April 2021, SHM claimed a manufacturer had offered a commitment of 25 million boxes of gloves from overseas factories in the next 12 months.

17.     SHM maintained it would deliver logistics, customers and coordinate financing as its part.

18.     In total, SHM sought a rolling investment of $50 million in a sustained production commitment, with a sales cycle of about 48-60 days or about 6 times a year.

19.     McGraw purchased the Inventory being sold by SHM.  SHM is in default of its payment obligations and other obligations to McGraw.

20.     The parties entered into several "Transaction Documents" including:

- Merchant Invoice Purchase Agreement dated November 17, 2020 – attached as Exhibit A;

- Merchant Invoice Purchase Agreement dated February 23, 2021 -- attached as Exhibit B;

- Merchant Invoice Purchase Agreement dated March 23, 2021 -- attached as Exhibit C;

- Merchant Invoice Purchase Agreement dated March 30, 2021 -- attached as Exhibit D;

- Trade Finance Agreement dated May 5, 2021 -- attached as Exhibit E;

- Promissory Note dated May 5, 2021 – attached as Exhibit F.

21.     Garrett Mann ("Mann") executed Agreements contained in the Transaction Documents as President of Safe Harvest Medical, LLC.

4

22.     Jason Tomlinson ("Tomlinson") executed Agreements contained in the Transaction Documents as Vice President of Safe Harvest Medical, LLC.

23.     Mann and Tomlinson, as individuals, executed a Personal Guaranty of Performance as part of the MIPA Transaction Documents.

24.     Mann and Tomlinson, as individuals, executed Anti-Fraud Guaranty as part of the MIPA Transaction Documents Agreements.

25.     True and correct copies of the Transaction Documents are attached hereto as Exhibits A – F.

26.     These Transaction Documents are part of a Forbearance Agreement which is attached as Exhibit G.

### November 2020 Purchase Agreement

27.     On November 17, 2020, McGraw and SHM entered into a Merchant Invoice Purchase Agreement (the "November 2020 MIPA"). A true and correct copy of the November 2020 MIPA is attached as Exhibit A.

28.     On or about November 16, 2020, SHM sold $333,540.00 worth of Receivables ("Inventory") to McGraw for $255,080.000.

29.     Payment was made via wire and was received by Safe Harvest Medical, LLC on or about November 18, 2020 in the amount of $255,080.00.

30.     SHM owes to McGraw the receivables it purchased.

31.     SHM has not paid McGraw the receivables it purchased.

### February 2021 Purchase Agreement

32.     On February 23, 2021, McGraw and SHM entered into a Merchant Invoice Purchase Agreement (the "February 2021 MIPA"). A true and correct copy of the February 2021 MIPA is attached as Exhibit B.

33.     On or about February 25, 2021, SHM sold "about $3,145,380.00" worth of Inventory to McGraw for $2,500,130.00.

34.     An additional payment was made on behalf of McGraw to Safe Harvest Medical, LLC on or about February 12, 2021 in the amount of $2,127,500.00.

35.     SHM owes to McGraw the Inventory it purchased.

36.     SHM has not paid McGraw the Inventory it purchased.

**March 2021 Purchase Agreements**

37.     On March 22, 2021, McGraw and SHM entered into a Merchant Invoice Purchase Agreement (the "March 22, 2021 MIPA"). A true and correct copy of the March 22, 2021 MIPA is attached as Exhibit C.

38.     On or about March 22, 2021, SHM sold "about $1,077,300.00" worth of receivables to McGraw for $1,500,000.00.

39.     A payment in the amount of $750,000.00 was wired to Safe Harvest Medical, LLC on behalf of McGraw on or about March 22, 2021.

40.     SHM owes to McGraw the Inventory it purchased.

41.     SHM has not paid McGraw the Inventory it purchased.

42.     On March 30, 2021, McGraw and SHM entered into a Merchant Invoice Purchase Agreement (the "March 30, 2021 MIPA").  A true and correct copy of the March 30, 2021 MIPA is attached as Exhibit D.

43.     On or about March 30, 2021, SHM sold "about $172,500.00" worth of receivables to McGraw for $150,000.00.

44.     A payment in the amount of $150,000.00 was wired to Safe Harvest Medical, LLC on behalf of McGraw on or about March 30, 2021.

45.     SHM owes to McGraw the Inventory it purchased.

6

46.     SHM has not paid McGraw the Inventory it purchased.

**Promissory Note of May 5, 2021**

47.     Also on May 5, 2021, SHM executed a Promissory Note in favor of McGraw in the amount of $715,000.

48.     McGraw promised to return $786,500.00 in four weeks.

49.     A true and correct copy of the Promissory Note is attached as Exhibit F.

50.     Payment was made via wire and was received by Safe Harvest Medical, LLC totaling $715,000.00 on or about May 5, 2021.

51.     SHM owes to McGraw the Inventory it purchased.

52.     SHM has not paid McGraw the Inventory it purchased.

53.     The MIPA Agreements, the Promissory Note, the Asset Transfer Agreement and any other documents and instruments delivered in connection with the Agreements are collectively referred to as the "Transaction Documents."

**Transaction Documents**

54.     In breach of the foregoing, SHM is in default of its payment obligation and other obligations under the Transaction Documents by failing to timely pay McGraw the Aggregate Amount Owed.

55.     SHM falsely represented that Future Receivables were imminent and verified, in violation of Sections 10.1(a) and 10.1(b) of the MIPA Agreements.

56.     SHM made materially false statements that Inventory could easily be acquired and sold, in violation of Section 10.1(b) of the MIPA Agreements.

57.     SHM failed to acquire valid ownership of any Purchased Receivables, given that no material sales of Inventory had occurred to date, in violation of Section 10.1(c) of the MIPA Agreements.

58.     McGraw has performed all conditions, covenants and promises required to be performed in accordance with the Transaction Documents, including payment to SHM.

59.     In breach of the foregoing, SHM falsely represented that Future Receivables were imminent and verified, in violation of Sections 10.1(a) and 10.1(b) of the MIPA Agreements.

60.     SHM automatically breached the TFA and Promissory Note by virtue of breaching the MIPA Agreements.

61.     On July 28, 2021, McGraw gave notice to SHM that it was in default of its obligations under the MIPA Agreements, the TFA, and Promissory Note.

62.     Section 13.1 of the MIPAs provides:

> In addition to any other remedies available to it, the Company shall be entitled to recover from Merchant any and all reasonable costs and attorney's fees associated with and/or resulting from the enforcement of its rights and remedies hereunder or at law or equity. Any payments pursuant to the foregoing shall include all foregoing costs and expenses, as well as interest thereon at a rate of 3% percent (3%) per month (or, if less, such rate as is the highest legally permissible rate) from the date the obligation is due until all such amounts are paid.

(Exs. A-D At § 13.1).

### Mann and Tomlinson's Guaranty Agreements

63.     Together with the MIPAs, Mann and Tomlinson each executed a Personal Guaranty of Performance and an Anti-Fraud Guaranty. (Exs. A – D).

64.     Per the Personal Guaranty of Performance, Mann and Tomlinson personally guaranteed "Merchant's [SHM] performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). (Exs. A - D).

65.     Per the Anti-Fraud Guaranty, Mann and Tomlinson personally guaranteed that all representations made in the Transaction Documents were true and correct.

66. Per the Anti-Fraud Guaranty, Mann and Tomlinson personally guaranteed that all representations made in the Transaction Documents were true and correct.

67. "Merchant's [SHM's] performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). (Exs. A - D).

68. Anti-Fraud Guaranty, Mann and Tomlinson's obligations became due "(i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts." (Exs. A – D).

69. Mann and Tomlinson's obligations are due and outstanding.

70. Additionally, the Anti-Fraud Guaranty provides: "Guarantor(s) shall not, except as otherwise required by the Processor Agreement, dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any business assets of Merchant without the prior written consent of the Company, which may be withheld for any reason, until the Company receives the entire Specified Amount." (Exs. A – D).

71. The Anti-Fraud Guaranties provide, in relevant part:

> Any legal action, suit or proceeding arising from the Merchant Invoice Purchase Agreement or this Fraud Guaranty, or the transactions contemplated hereby or thereby, may be instituted in any state or federal court of competent subject matter jurisdiction in the State of Illinois. The Guarantor(s) hereby knowingly and voluntarily consent to personal jurisdiction in the courts of the State of Illinois with respect to any such legal action, suit or proceeding. The Guarantor(s) hereby irrevocably consent to the service of process in any of the aforementioned courts in any such action, suit or proceeding by certified US Mail, postage prepaid, to him/her/them at the address (es) set forth below. The Guarantor(s) knowingly and voluntarily waive any claim or defense in any action, suit or proceeding

9

commenced in the Illinois State Court or the United States District Court for the District of Northern Illinois, asserting that he/she/they is/are not subject personally to the jurisdiction of such court, that service upon him/her/them as hereinabove set forth is invalid, that his/her/their property is immune or exempt form attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that the Merchant Cash Advance Agreement or this Fraud Guaranty, or the subject matter hereof, may not be enforced in or by such court.

(Exs. A –F).

72.     Per the Anti-Fraud Guaranty, Mann and Tomlinson personally guaranteed to pay for "all costs and attorneys' fees in connection with any action commenced by the Company [McGraw]… to enforce their rights under the Merchant Cash Agreement and/or this Fraud Guaranty". (Exs. A - D).

73.     The obligations of the Guarantor's, Mann and Tomlinson, are joint and several.

### Forbearance Agreement

74.     On August 24, 2021, SHM entered into a Forbearance Agreement with McGraw and concurrently therewith, an Asset Transfer Agreement. A true and correct copy of the Forbearance Agreement is attached as Exhibit G. A true and correct copy of the Asset Transfer Agreement is attached as Exhibit H.

75.     SHM is in default of its payment obligations and other obligations under the Transaction Documents by failing to timely pay to McGraw the Aggregate Amount Owed.

76.      Pursuant to the terms of the Forbearance Agreement SHM confirmed that (i) it is indebted and obligated to McGraw under the Transaction Documents for the Aggregate in default of its payment obligations and other obligations under the Transaction Documents by failing to timely pay to McGraw the Aggregate Amount Owed and it is in default of each of the Agreements in the following dollar amounts:

| Deal | Deal Total Owed | Grand Total Owed |
|------|-----------------|------------------|
| 1 | $ 536,177.61 | $ 536,177.61 |
| 2 | $ 1,244,871.00 | $ 1,781,048.61 |
| 3 | $ 2,864,681.71 | $ 4,645,730.32 |
| 4 | $ 2,864,685.71 | $ 7,510,416.03 |
| 5 | $ 197,242.77 | $ 7,707,658.80 |
| 6 | $ 802,230.00 | $ 8,509,888.80 |

(Ex. G at § 2).

77.    SHM agreed to indemnify and save [McGraw] and its officers, managers, employees, agents, designees, attorneys, and accountants (collectively, "Representatives") harmless from and against any and all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) to which any of them may become subject which arise from or relate to this Agreement, or any of the other Transaction Documents, or any action or alleged action or effort taken or alleged to have been taken by Merchant in connection with any action or forbearance in action contemplated hereunder (collectively, the "Claims"). The Company shall have the sole and complete control of the defense of any such Claims. The Company is hereby authorized to settle or otherwise compromise any such Claims as the Company in good faith determines shall be in its best interests. The obligations of Merchant under this Section 20 shall survive the repayment of the Aggregate Amount Owed (subject to Section 3(c)), and the performance of its Obligations under the Agreements and the other Transaction Documents.

78.    SHM is obligated to pay and reimburse the Company for all actual fees, costs, and expenses, including all actual attorneys' fees and costs, fees and costs expended or incurred by the Company in connection with (i) the negotiation, preparation, amendment, interpretation, implementation, and enforcement of this Agreement, or any instrument or agreement executed in connection herewith , including the preparation and negotiation of this Agreement, during any

11

workout or attempted workout, or in connection with the rendering of legal advice as to the Company's rights, remedies, and obligations under the Transaction Documents; (ii) collecting any sum which becomes due the Company under the Transaction Documents; (iii) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal; or (iv) the protection.

79.     In connection with the Forbearance Agreement, SHM admitted it was in default of its payment obligations and other obligations under the Transaction Documents by failing to pay McGraw the Aggregate Amount Owed as defined therein.

80.     SHM specifically confirmed and acknowledged that it is indebted and obligated to Company under the Transaction Documents for the Aggregate Amount Owed and it has failed to timely pay the Aggregate Amount Owed, and it is therefore in default of each of the Agreements.

81.     The Forbearance Agreement was conditioned upon SHM satisfying all of its obligations under the Transaction Documents and under the Forbearance Agreement on or before including without out limitation the payment in full of the Aggregate Amount Owned as defined by the Transaction Documents.

82.     Pursuant to the terms of the Forbearance Agreement, Defendants are immediately liable for the full Aggregate Amount Owed, and shall be required to remit 100% of the proceeds from the sale of Inventory to the Company, in the event that SHM at any time defaults under this Agreement or under any of the other Transaction Documents, or contests the validity and enforceability hereof or thereof.

**Asset Transfer Agreement**

83.     Per the Asset Transfer Agreement, SHM acknowledged and agreed that it is in material default of its obligations under the MIPA Agreements, the Trade Finance Agreement, the Promissory Note and/or other agreements and instruments.  (Ex. H at ¶ 2).

84.     Under the Asset Transfer agreement and pursuant to the Forbearance Agreement, SHM irrevocably assigned, transferred and conveyed to McGraw, without recourse, all of SHM's Accounts Receivable and other rights and interests which SHM receives or becomes entitled to receive in connection with the sale of personal protective equipment and other goods and/or the provision of services, including, without limitation (i) all of SHM's present and future Accounts Receivable, (ii) upon McGraw's election all of SHM's right, title and interest in and to the Inventory represented by the Accounts Receivable, including goods that may be returned by SHM's customers, (iii) all of its rights against third parties with respect to the Accounts Receivable, and (iv) the assets identified in Schedule A of the Asset Transfer Agreement.  (Ex. K at ¶ 5).

85.     The Transaction Documents are true and correct all such representations and warranties therein survive the execution of the Forbearance Agreement.

86.     The representation, warranties, and agreements set forth in the Transaction Documents are cumulative and in addition to all other representations, warranties, and agreements which SHM gave or ceased to be given to McGraw.

87.     By virtue of SHM's foregoing breaches, Mann and Tomlinson are automatically in breach of their Personal Guaranty's.

## COUNT I –PROMISSORY ESTOPPEL  – SHM

88.     McGraw incorporates the allegations contained in paragraphs 1 – 87 as if set forth fully herein.

89.     SHM made unambiguous promises to McGraw including that it was capable of paying McGraw what it was owed pursuant to the Transaction Documents.

90.     SHM expected and could foresee that McGraw would rely on its promises.

91.     McGraw relied on SHM's promises to its material detriment including paying SHM more than $4,115,130.00.

92.     As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

93.     Pursuant to the terms of the Forbearance Agreement SHM confirmed that (i) it is indebted and obligated to McGraw under the Transaction Documents for the Aggregate in default of its payment obligations and other obligations under the Transaction Documents by failing to timely pay to McGraw the Aggregate Amount Owed and it is in default of each of the Agreements in the following dollar amounts:

| Deal | Deal Total Owed | Grand Total Owed |
|------|-----------------|------------------|
| 1 | $ 536,177.61 | $ 536,177.61 |
| 2 | $ 1,244,871.00 | $ 1,781,048.61 |
| 3 | $ 2,864,681.71 | $ 4,645,730.32 |
| 4 | $ 2,864,685.71 | $ 7,510,416.03 |
| 5 | $ 197,242.77 | $ 7,707,658.80 |
| 6 | $ 802,230.00 | $ 8,509,888.80 |

(Ex. G at § 2).

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC, prays for judgment against Defendants, individually as follows:

1.      For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2.      For monetary relief in an amount to be proven at trial and for interest therefrom;

3.      For exemplary and punitive damages, according to proof at trial;

14

4.      For attorney's fees and costs;

5.      For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and,

6.      For such other or further relief as the court may deem just or proper.

## COUNT II – BREACH OF CONTRACT – SHM, MANN and TOMLINSON

94.      McGraw incorporates the allegations contained in paragraphs 1 – 93 as if set forth in full herein.

95.      McGraw and SHM entered into the Transaction Documents.

96.      Tomlinson and Mann executed Guaranty's for SHM's performance of obligations contained in the Transaction Documents.

97.      McGraw purchased SHM's entire right, title, and interest to certain invoices/accounts receivable of SHM's for the purchase price in each MIPA.

98.      SHM verified that the receipts purchased by McGraw were due and payable and owing SHM.

99.      McGraw accepted SHM's offer and McGraw provided good and valuable consideration to SHM, paying millions of dollars for the receipts.

100.      By signing the MIPA's, SHM promised to perform its duties and obligations under the MIPA Agreements including but not limited to, paying McGraw and the obligation to indemnify McGraw as well as pay its attorney's fees.

101.      Moreover, to induce the Company to accept Merchant's application and to enter into the Merchant Cash Advance Agreement, Defendants Mann and Tomlinson agreed guaranty performance and to pay any and all costs and attorneys' fees in connection with any action commenced by the Company to enforce their rights under the Transaction Documents.

102.    By signing the Agreements, Defendant Mann and Tomlinson assumed and guarantied all of SHM's obligations under the Transaction Documents including but not limited to, the obligation to indemnify McGraw.

103.    Defendants breached the Agreements by failing to pay McGraw the amounts due and owing.

104.    As SHM has breached its obligation to perform, pursuant to the terms and conditions of the Transaction Documents, Defendants Mann and Tomlinson are obligated to pay McGraw the amounts due and owing.

105.    SHM and McGraw executed a Forbearance Agreement on July 24, 2021.

106.    In connection with the Forbearance Agreement, SHM admitted it was in default of its payment obligations and other obligations under the Transaction Documents by failing to pay McGraw the Aggregate Amount Owed as defined therein.

107.    SHM specifically confirmed and acknowledged that it is indebted and obligated to Company under the Transaction Documents for the Aggregate Amount Owed and it has failed to timely pay the Aggregate Amount Owed, and it is therefore in default of each of the Agreements.

108.    The Forbearance Agreement was conditioned upon SHM satisfying all of its obligations under the Transaction Documents and under the Forbearance Agreement on or before including without out limitation the payment in full of the Aggregate Amount Owned as defined by the Transaction Documents.

109.    Pursuant to the terms of the Forbearance Agreement, Defendants are immediately liable for the full Aggregate Amount Owed, and shall be required to remit 100% of the proceeds from the sale of Inventory to the Company, in the event that SHM at any time defaults under this

16

Agreement or under any of the other Transaction Documents, or contests the validity and enforceability hereof or thereof.

110.     As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.     For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2.     For monetary relief in an amount to be proven at trial and for interest therefrom;

3.     For exemplary and punitive damages, according to proof at trial;

4.     For attorney's fees and costs;

5.     For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and,

6.     For such other or further relief as the court may deem just or proper.

## COUNT III– FRAUD – SHM, MANN and TOMLINSON

111.     McGraw incorporates the allegations contained in paragraphs 1 –110 as if set forth in full herein.

112.     McGraw and SHM entered into the Transaction Documents whereby McGraw purchased SHM's entire right, title, and interest to certain invoices/accounts receivable of SHM's, for the purchase price set out therein.

113.     Per the terms of each of the MIPA Agreements, SHM represented that its entire right, title and interest in a percentage specified herein to certain invoices/accounts receivable of

the Merchant that have been verified by the Merchant as due and payable and owed to Merchant, including both Current Receivables and Future Receivables. (Exs. A-D at p. 1).

114. Further, SHM represented that it has completed the work required and completed any and all other obligations under the purchased invoices necessary for it to have right, title and interest in the Purchased Receivables, (b) the invoices associated with the Purchased Receivables are due and payable by each relevant customer, (c) no customer or any other person or entity is contesting or has threated to contest Merchant's right, title and interest in the Purchased Receivables, (d) it has not entered into any other agreement or arrangement for the purchase, repurchase, sale, resale pledge or other form of disposition or encumbrance, whether directly or indirectly, of all or any portion of the Purchased Receivables. (Exs. A-D at § 1.2).

115. SHM falsely represented that Future Receivables were imminent and verified.

116. SHM made materially false statements that inventory giving rise to the Receivables could easily be acquired and sold.

117. At the time of the representations, SHM knew that the representations were false as SHM failed to acquire valid ownership of any Purchased Receivables, given that no material sales of Inventory had occurred to date.

118. SHM made the representations to McGraw in an effort to induce McGraw into providing the financing it needed.

119. Based on these representations, McGraw in fact purchased the Inventory offered by SHM pursuant to the Transaction Documents.

120. As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and

18

prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1. For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2. For monetary relief in an amount to be proven at trial and for interest therefrom;

3. For exemplary and punitive damages;

4. For attorney's fees and costs;

5. For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and,

6. For such other or further relief as the court may deem just or proper.

## COUNT IV – FRAUDULENT CONCEALMENT – SHM, MANN and TOMLINSON

121. McGraw incorporates the allegations contained in paragraphs 1 – 120 as if set forth in full herein.

122. SHM represented that its entire right, title and interest in a percentage specified herein to certain invoices/accounts receivable of the Merchant that have been verified by the Merchant as due and payable and owed to Merchant, including both Current Receivables and Future Receivables. (Exs. A-D at p. 1).

123. Further, SHM represented that it has completed the work required and completed any and all other obligations under the purchased invoices necessary for it to have right, title and interest in the Purchased Receivables, (b) the invoices associated with the Purchased Receivables are due and payable by each relevant customer, (c) no customer or any other person or entity is contesting or has threated to contest Merchant's right, title and interest in the Purchased

Receivables, (d) it has not entered into any other agreement or arrangement for the purchase, repurchase, sale, resale pledge or other form of disposition or encumbrance, whether directly or indirectly, of all or any portion of the Purchased Receivables. (Exs. A-D at § 1.2).

124. In concealing the fact that Future Receivables were not imminent and verified and falsely stating that Inventory could easily be acquired and sold, Defendants made a false concealment of material fact during the course of the negotiation process.

125. Defendants knew that its concealment was false and fraudulent at the time it was made by Defendants.

126. Defendants made this concealment with the intent to induce McGraw to sign the Transaction Documents. That concealment was separate and distinct from the contractual representations in the Transaction Documents.

127. McGraw justifiably and reasonably relied on that concealment by entering into the Transaction Documents. That fraudulent concealment was intended to - and did – induce McGraw to enter into the Transaction Documents, continue to perform under the Transaction Documents, and make payments to Defendants under the Transaction Documents.

128. Defendants continued to conceal the false statements through and after the time that McGraw signed the Transaction Documents, and Defendants never revealed such falsities to McGraw.

129. McGraw did not and could not have reasonably discovered the concealments until after the execution of the Transaction Documents.

130. As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and

prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.  For monetary relief in an amount to be proven at trial and for interest thereon;

2.  For exemplary and punitive damages, according to proof at trial;

3.  For attorney's fees and costs;

4.  For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

5.  For such other or further relief as the court may deem just or proper.

## COUNT V – CONVERSION – SHM, MANN and TOMLINSON

131. McGraw incorporates the allegations contained in paragraphs 1 – 130 as if set forth in full herein.

132. McGraw is the sole owner of the gloves purchased pursuant to the Transaction Documents.

133. McGraw is the sole owner of the Inventory purchased pursuant to the Transaction Documents.

134. At all times mentioned in this complaint and continuously to the present time, McGraw has an absolute and unconditional right to immediate possession of the gloves and all Inventory, including but not limited to all of SHM's present and future accounts receivables. (Exs. H at p. 2).

135. McGraw demanded possession from the Defendants of the gloves and Inventory as well as past and future accounts receivables.

136.    McGraw expects that this violation will continue during this litigation as it has to the present time.

137.    As a result of the Defendants continuing violations, McGraw has suffered, and continues to suffer, a loss of value.

138.    Defendants have engaged in a course of conduct designed to purposely conceal its unauthorized taking and thereby wrongfully exercised assumed authority over the gloves, Inventory and SHM's present and future accounts receivables depriving McGraw of possession of the gloves Inventory and SHM's present and future accounts receivables and thus destroying or limiting their value to McGraw.

139.    McGraw demands possession of the gloves, Inventory and SHM's present and future accounts receivables as their separate and exclusive property. (Exs. H at p. 2).

140.    McGraw is entitled to notice and immediate possession of the gloves, Inventory and SHM's present and future accounts receivables that were wrongfully converted by Defendants.

141.    The conversion has resulted in damages in excess of the jurisdictional requirement of this Court and McGraw has been forced to expend attorneys' fees and costs and has otherwise been damaged by this action.

142.    As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.    For monetary relief in an amount to be proven at trial and for interest thereon;

2.      For exemplary and punitive damages, according to proof at trial;

3.      For attorney's fees and costs;

4.      For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

5.      For such other or further relief as the court may deem just or proper.

## COUNT VI – UNJUST ENRICHMENT

143.     McGraw incorporates the allegations contained in paragraphs 1 –142 as if set forth in full herein.

144.     McGraw's payment to Defendants of certain sums for the purchase of the Inventory conferred a benefit upon Defendants.

145.     Defendants knowingly accepted the benefit.

146.     Defendants failed to acquire the Inventory.

147.     Defendants' retention and use of the sums under the circumstances is unjust.

148.     Defendants have been unjustly enriched in the amount of the Debt.

149.     McGraw and Defendants entered into the Forbearance Agreement wherein it acknowledged its unjust enrichment in the amount of the Debt.

150.     By signing the MIPA's, SHM promised to perform its duties and obligations under the MIPA Agreements including but not limited to, paying McGraw and the obligation to indemnify McGraw as well as pay its attorney's fees.

151.     Moreover, to induce the Company to accept Merchant's application and to enter into the Merchant Cash Advance Agreement, Defendants Mann and Tomlinson agreed guaranty performance and to pay any and all costs and attorneys' fees in connection with any action commenced by the Company to enforce their rights under the Transaction Documents.

152.    By signing the Agreements, Defendant Mann and Tomlinson assumed and guarantied all of SHM's obligations under the Transaction Documents including but not limited to, the obligation to indemnify McGraw.

153.    As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.    For monetary relief in an amount to be proven at trial and for interest thereon;

2.    For exemplary and punitive damages, according to proof at trial;

3.    For attorney's fees and costs;

4.    For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

5.    For such other or further relief as the court may deem just or proper.

## COUNT VII – VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

154.    McGraw incorporates the allegations contained in paragraphs 1 – 153 as if set forth in full herein.

155.    Defendants engaged in deceptive acts and practices, including, among other things, representing that its entire right, title and interest in a percentage specified herein to certain invoices/accounts receivable of the Merchant that have been verified by the Merchant as due and payable and owed to Merchant, including both Current Receivables and Future Receivables and that they had completed the work required and completed any and all other obligations under the

purchased invoices necessary for it to have right, title and interest in the Purchased Receivables, (b) the invoices associated with the Purchased Receivables are due and payable by each relevant customer, (c) no customer or any other person or entity is contesting or has threated to contest Merchant's right, title and interest in the Purchased Receivables, (d) it has not entered into any other agreement or arrangement for the purchase, repurchase, sale, resale pledge or other form of disposition or encumbrance, whether directly or indirectly, of all or any portion of the Purchased Receivables.

156. Defendants intended that McGraw rely on its false and misleading misrepresentations.

157. Defendants engaged in the deceptive acts in the course of trade or commerce.

158. Defendants' deceptive acts and practices affect the market generally and implicate consumer protection concerns.

159. Defendants' deceptive acts are the actual and proximate causes of injury to McGraw and has caused damage to McGraw in an amount to be determined at trial.

160. As a direct and proximate result of the foregoing, McGraw has suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1. For monetary relief in an amount to be proven at trial and for interest thereon;

2. For exemplary and punitive damages, according to proof at trial;

3. For attorney's fees and costs;

4. For pre-judgment and post-judgment interest at the legal rate and penalties to the

maximum extent permissible; and

5.     For such other or further relief as the court may deem just or proper.

## COUNT VIII – BREACH OF PERSONAL GUARANTY – MANN

161.     McGraw incorporates the allegations contained in paragraphs 1 – 160 as if set forth in full herein.

162.     McGraw and SHM entered into Transaction Documents whereby SHM wished to sell, assign, and transfer and McGraw wished to purchase, SHM's entire right, title, and interest to certain invoices/accounts receivable of SHM's, for the purchase price set out therein. (Exs. A – D).

163.     In conjunction with each of the MIPA Agreements, Mann executed a personal guaranty of performance through which he unconditionally guaranteed SHM's performance of all of the representations, warranties, covenants made by SHM (the "Mann Personal Guarantees"). A true and correct copy of the Mann Personal Guarantees are contained in the MIPA Agreements at Exhibits A – D.

164.     By signing the Guaranty, Mann assumed and guarantied all of SHM's obligations under the Transaction Documents including but not limited to, the obligation to indemnify McGraw. (Exs. A – D).

165.     Moreover, pursuant to the Anti-Fraud Guaranty, Mann agreed to conduct, and cause Merchant to conduct, business in the ordinary course and in substantially the same manner as heretofore conducted and use commercially reasonable efforts not to commit any act that results in a material reduction of Merchant's credit card transaction volume. (Exs. A – F).

166. Moreover, pursuant to the Anti-Fraud Guaranty, Mann agreed to not dispose, convey, sell or otherwise transfer, or cause SHM to dispose, convey, sell or otherwise transfer, any business assets of SHM without prior consent of McGraw.

167. Mann also personally guaranteed to pay for "all costs and attorneys' fees in connection with any action commenced by the Company [McGraw]… to enforce their rights" under the Merchant Cash Agreement and/or this Fraud Guaranty. (Exs. A – D).

168. As SHM has breached its obligation to perform, pursuant to the terms and conditions of the Mann Personal Guarantees, Mann is obligated to pay McGraw the amounts due and owing.

169. Mann breached the Personal Guarantees by failing to pay McGraw the amounts due and owing.

170. As a direct and proximate result of the foregoing, McGraw has been caused to incur significant attorney's fees, suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1. For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2. For monetary relief in an amount to be proven at trial and for interest thereon;

3. For exemplary and punitive damages, according to proof at trial;

4. For attorney's fees and costs;

5. For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

6.     For such other or further relief as the court may deem just or proper.

## COUNT IX – BREACH OF PERSONAL GUARANTY – TOMLINSON

171.    McGraw incorporates the allegations contained in paragraphs 1 – 170 as if set forth in full herein.

172.    McGraw and SHM entered into Transaction Documents whereby SHM wished to sell, assign, and transfer and McGraw wished to purchase, SHM's entire right, title, and interest to certain invoices/accounts receivable of SHM's, for the purchase price set out therein. (Exs. A – D).

173.    In conjunction with each of the MIPA Agreements, Tomlinson executed a personal guaranty of performance through which he unconditionally guaranteed SHM's performance of all of the representations, warranties, covenants made by SHM (the "Tomlinson Personal Guarantees"). A true and correct copy of the Tomlinson Personal Guarantees are contained in the MIPA Agreements at Exhibits A – D.

174.    By signing the Guaranty, Tomlinson assumed and guarantied all of SHM's obligations under the MIPA Agreements including but not limited to, the obligation to indemnify McGraw. (Exs. A – D).

175.    Moreover, pursuant to the Anti-Fraud Guaranty, Tomlinson agreed to conduct, and cause Merchant to conduct, business in the ordinary course and in substantially the same manner as heretofore conducted and use commercially reasonable efforts not to commit any act that results in a material reduction of Merchant's credit card transaction volume. (Exs. A – D).

176.    As SHM has breached its obligation to perform, pursuant to the terms and conditions of the Tomlinson Personal Guarantees, Tomlinson is obligated to pay McGraw the amounts due and owing.

177.    Tomlinson breached the Personal Guarantees by failing to pay McGraw the amounts due and owing.

178.    As a direct and proximate result of the foregoing, McGraw has suffered direct and consequential damages, and statutory and prejudgment interest, in excess of the jurisdictional minimum of this court in an amount to be determined at trial.

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.    For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2.    For monetary relief in an amount to be proven at trial and for interest thereon;

3.    For exemplary and punitive damages, according to proof at trial;

4.    For attorney's fees and costs;

5.    For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

6.    For such other or further relief as the court may deem just or proper.

## PRAYER FOR RELIEF

WHEREFORE, White Thorne Capital, LLC f/k/a McGraw Capital Partners, LLC prays for judgment against Defendants as follows:

1.    For the Aggregate Amount of $8,509,888.80 agreed to in the Forbearance Agreement;

2.    For monetary relief in an amount to be proven at trial and for interest thereon;

3.    For exemplary and punitive damages, according to proof at trial;

4.    For attorney's fees and costs;

5.    For pre-judgment and post-judgment interest at the legal rate and penalties to the maximum extent permissible; and

LEGAL\56597229\1

6. For such other or further relief as the court may deem just or proper.

Dated: March 15, 2022

        COZEN O'CONNOR
        *Attorneys for Plaintiff*


     BY: */s/Tia C. Ghattas*
       Tia C. Ghattas (6269818)
       Paul Connell (6257035)
       Amy M. Doig (6310825)
       COZEN O'CONNOR
       123 N. Wacker Drive
       Chicago, IL 60606
       (312) 382-3100
       tghattas@cozen.com
       adoig@cozen.com

LEGAL\56597229\1