

# MERCHANT INVOICE PURCHASE AGREEMENT

**THIS AGREEMENT** ("Agreement") made effective as of the ___23RD___ day of __FEBRUARY__, __2021__.

**BETWEEN**:

<b>McGraw Capital Partners, LLC</b><br>
68 S. Service Road, Suite 100<br>
Melville, NY 11747<br>
("Company")

- and -

NameSafe Harvest Medical, LLC

Address201 East 5th St., Ste. 1200, Sheridan, WY 82801

**WHEREAS**, Merchant wishes to sell, assign and transfer, without recourse (except to the extent provided herein), and Company wishes to purchase, for the purchase price set out below ("Purchase Price"), Merchant's entire right, title and interest in a percentage specified herein to certain invoices/accounts receivable of the Merchant that have been verified by the Merchant as due and payable and owed to Merchant ("Purchased Receivables"), including both Current Receivables and Future Receivables:

| | |
|---|---|
| Purchased Receivables | $__about__3,145,380.00__ |
| Purchase Price | $___2,500,130.00___ |
| Already Funded 11/17/2020: | $_____255,130.00 to Safe Harvest Medical___ |
| Already Funded 02/12/2021: | $___2,127,500.00 to Morgan Stanley Escxrow Account___ |
| Net New Monies: | $_____117,500.00 to Safe Harvest Medical_____ |
| Rate | __1.xx__ |
| Net Amount Funded | $__117,500.00_____ |
| Late Payment Accrual Rate | %__1.50 Per Week__ |
| Funding Start Date | ON OR ABOUT FEBRUARY 24, 2021 |
| REPAYMENT | **AS DEFINED IN EXHBIT 1** |

**EXHIBIT B**

    STIPULATIONS:
1) CLIENT IS PROHIBITED FROM ADDITIONAL FUNDING OVER THE FUNDING PERIOD, INCLUDING LATE REPAYMENTS, WITHOUT APPROVAL OF MCGRAW CAPITAL PARTNERS; VIOLATION WILL RESULT IN A $15,000 CHARGE FOR THE FIRST VIOLATION, AND $5,000 CHARGE FOR THE SECOND VIOLATION.
2) CLIENT PROVIDES MONTHLY BANK STATEMENTS FROM THE COMPANY'S OPERATING ACCOUNT(S) WITHIN THREE (3) BUSINESS DAYS OF THE END OF THE STATEMENT PERIOD.

The receiver \_\_\_\_SAFE HARVEST MEDICAL, LLC_____ ("MERCHANT") agrees to be bound by the ACH rules of NACHA.

**NOW THEREFORE**, in consideration of the covenants, promises and representations set forth herein, and for other good an valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Company and Merchant agree as follows:

**1.**     **Transaction**

1.1     The purchase and sale of the Purchased Receivables pursuant hereto shall constitute a sale of accounts as such term is used in Article 9 of the Uniform Commercial Code ("UCC"), which sales are absolute and irrevocable, and provide the Company with the full benefits of ownership of Purchased Receivables. Merchant has no right to repurchase, resell, assign, convey, transfer, charge, hypothecate, pledge or otherwise dispose of or encumber, directly or indirectly, the Purchased Receivables.

1.2     Merchant hereby represents and warrants that (a) it has completed the work required and completed any and all other obligations under the purchased invoices necessary for it to have right, title and interest in the Purchased Receivables, (b) the invoices associated with the Purchased Receivables are due and payable by each relevant customer, (c) no customer or any other person or entity is contesting or has threated to contest Merchant's right, title and interest in the Purchased Receivables, (d) it has not entered into any other agreement or arrangement for the purchase, repurchase, sale, resale pledge or other form of disposition or encumberance, whether directly or indirectly, of all or any portion of the Purchased Receivables. Client may not enter into any agreement for receivables purchase, which would render all funds outstanding due immediately.

1.3     In connection with the foregoing purchase and sale, Merchant hereby irrevocably authorizes the Company to file one (1) or more financing or continuation statements, or amendments thereto, without the signature of the Merchant where permitted by law, as may be necessary or appropriate to perfect and maintain the perfection of the Company's ownership in the Purchased Receivables. Merchant agrees not to (a) contest the validity of any such financing or continuation statements, or amendments thereto, filed by Company in accordance with this Agreement or (b) file, approve or otherwise support any financing or continuation statements other than those filed by Company in accordance with this Agreement. Merchant represents and warrants that, as of the date hereof, to the best of its knowledge, no financing or continuation statements with respect to the Purchased Receivables has been filed.

1.4     Merchant and Company agree that the Purchase Price under this Agreement is in exchange for the Receivable Value and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that Company has charged or received interest hereunder in

excess of the highest rate allowed by law, then the rate in effect here under shall automatically be reduced to the maximum rate permitted by applicable law and Company shall promptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Company not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

1.5  At the Merchant's option, within five (5) business days following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Buyer may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Buyer - but in no event later than five (5) business days following the end of the calendar month - the Merchant must produce any and all evidence and documentation requested by Buyer in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. The foregoing includes without limitation, any and all bank statements, merchant statements or other documents necessary to ascertain the amounts of the Specified Percentage, including login to the Merchant's bank account(s).

1.6  The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Buyer is under no obligation to provide same, and (ii) if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then Buyer shall not effectuate the reconciliation discussed above.

**2.     Security Interest**

2.1  In the event that this Agreement does not constitute a valid sale, assignment, transfer and conveyance of all right, title and interest of Merchant in the Purchased Receivables, despite the intent of the parties hereto, the Merchant hereby grants a "security interest" (as defined in the UCC) in the Purchased Receivables and the parties agree that this Agreement shall constitute a security agreement under the UCC. Merchant hereby irrevocably authorizes the Company to file one or more financing or continuation statements, and amendments thereto, without the signature of Merchant where permitted by law and, in such cases, to observe its obligations and make the representation and warranty set forth in Section 1.3 above.

**3.     Process**

3.1  In accordance with Exhibit 1, attached, upon payment by the Customer to the Merchant, the Merchant will remit to the Company the remaining funds minus expenses and associated fees.

**4.     Due Diligence**

4.1  Merchant authorizes the Company to conduct background, onsite and financial examinations of Merchant, which may include, but is not limited to, address verifications for up to ten (10) years; verification of the status of the licenses, permits, authorizations and/or governmental filings of Merchant; verification of insurance coverage; verification of good business practices through the appropriate agencies; and a search for bankruptcies, liens or judgments in all jurisdictions where Merchant has conducted business.

4.2  Any onsite examination may include, but is not limited to, verification that business is conducted as Merchant represents, at all sites where it conducts business. Such examination shall be conducted upon reasonable prior notice to Merchant, and only during reasonable business hours.

4.3  Any financial examination may include, but is not limited to, a review of Merchant's current financial statements and banking statements, its most recent annual reports, tax returns for the previous three (3) years, and all documentation supporting employee bonds and insurance policies.

4.4 If Merchant is not publicly held, Company, or its agents, may conduct background and financial examinations of all principals owning or controlling, directly or indirectly, ten percent (10%) or more of Merchant. Such examinations may include, but are not limited to, a review of information regarding criminal history for all jurisdictions where the principal has resided and been employed, address verification for all residences, and employment verification. The examination may also include, but is not limited to, a review of the credit standing of the principal, and a search for bankruptcies and judgments in all jurisdictions where the principal has resided or been employed. The review may also include a review of up to three (3) years of personal tax returns.

**5. Modification**

5.1 Merchant shall comply with all terms and provisions of this Agreement and the Processor Agreement and shall not modify or cancel either this Agreement or the Processor Agreement at any time or in any manner.

**6. Stacking Prohibited**

6.1 Merchant shall not enter into any merchant cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

**7. Covenants, Representations and Warranties**

7.1 **UPON THE OCCURRENCE OF AN EVENT OF DEFAULT BY MERCHANT UNDER THIS PURCHASE AGREEMENT, MERCHANT IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT FOR SUCH SUMS AS ARE DUE AND/OR MAY BECOME DUE UNDER THIS PURCHASE AGREEMENT OR ANY ACCOMPANYING DOCUMENTS, WITH OR WITHOUT DECLARATION, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT EQUAL TO TEN PERCENT (10%) OF THE AMOUNT OF SUCH JUDGMENT, BUT NOT LESS THAN ONE THOUSAND DOLLARS ($1,000.00), ADDED FOR ATTORNEY FEES TO THE EXTENT PERMITTED BY LAW, MERCHANT SELLER: (1) WAIVES THE RIGHT OF INQUISITION ON ANY REAL ESTATE LEVIED ON, VOLUNTARILY CONDEMNS THE SAME, AUTHORIZES THE PROTHONOTARY OR CLERK TO ENTER UPON THE WRIT OF EXECUTION THIS VOLUNTARY CONDEMNATION AND AGREES THAT ANY REAL ESTATE MAY BE SOLD ON A WRIT OF EXECUTION; (2) WAIVES AND RELEASES ALL RELIEF FROM ALL APPRAISEMENT, STAY, EXEMPTION, OR APPEAL LAWS OF ANY STATE NOW IN FORCE OR HEREINAFTER ENACTED; AND (3) RELEASES ALL ERRORS IN SUCH PROCEEDINGS. IF A COPY OF THIS PURCHASE AGREEMENT, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF PURCHASER SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL PURCHASE AGREEMENT AS A WARRANT OF ATTORNEY. THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE THEREOF AND MAY BE EXERCISED AS OFTEN AS PURCHASER SHALL FIND IT NECESSARY AND DESIRABLE AND THIS PURCHASE AGREEMENT SHALL BE A SUFFICIENT WARRANT THEREFOR. PURCHASER MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNTS OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR ALL OR ANY PART OF THE SAME AMOUNTS. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST THE MERCHANT HEREUNDER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON MERCHANT'S BEHALF FOR ANY REASON, PURCHASER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT FOR ANY PART OR ALL OF THE AMOUNTS OWED HEREUNDER, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY ERRORS AND DEFECTS IN SUCH PRIOR PROCEEDINGS.**

Merchant Seller's Initials: _____     Merchant Seller's Initials: _____

7.2 **POWER OF ATTORNEY:** Merchant irrevocably appoints the Company as its agent and attorney-in-fact with full authority or to take any action and execute any document to settle any obligations due the Company from any bank or processor or anyone else or from the Merchant in the event of the Merchant's violation of this purchase agreement or the occurance of an Event of Default under this Agreement, including, without limitation, the right to: (i) obtain and/or adjust insurance, (ii) collect monies due or become due or in respect of any of the collateral (when applicable); receive, endorse, and/or collect any notes, checks, drafts, instrucments, documents, or chattel paper in connection with clause (i) or clause (ii), (iv) sign Merchant's name on any invoice, bill of lading, assignment, writing, document or other instrument directing Merchant's customers and/or account obligors to make payments directly to Company; and/or (v)file any claims or take any action or institute any proceeding that the Company deems necessary for collection of the unpaid Receivables Purchased Amount from the Collateral (where applicable) or otherwise to enforce its right with respect to payment of the Receivables Purchased Amount.

7.3 Merchant shall not conduct business under any other name than that disclosed herein, and shall not change the location of the business, or the state of formation without the Company's prior written consent. Further, unless and until the Purchased Receivables have been paid in full, Merchant and its owners shall not enter into any transaction involving the sale of Merchant, either by an issuance, sale or transfer of ownership interests in Merchant that results in a change in voting control or beneficial ownership of Merchant; by a sale or transfer of substantially all of the assets of Merchant; or otherwise. The occurrence of any such event shall constitute a breach of this Agreement.

7.4 If an entity, Merchant is a validly existing [corporation/limited liability company/limited partnership/limited liability partnership], in good standing under the laws of the state of incorporation. Execution and delivery of this Agreement by Merchant has been authorized by all necessary corporate or other action. The person executing this Agreement on behalf of Merchant has full power and complete authority to execute this Agreement on behalf of Merchant, and this Agreement is valid, binding and enforceable against Merchant.

7.5 There are no civil or criminal proceedings pending before any court, government agency, arbitration panel, or administrative tribunal or, to Merchant's knowledge, threatened against Merchant, which may result in any adverse change in the business, property or financial condition of Merchant or Merchant's ability to perform its obligations under this Agreement.

7.6 Merchant is in compliance with any and all applicable federal, state and local laws and regulations, and possesses and is in compliance with any and all permits, authorizations and licenses to own, operate and lease its properties, and to conduct the business in which it is presently engaged. Merchant currently possesses and hereby covenants to maintain insurance in such amounts and against such risks as is reasonably necessary or advisable to protect its business and assets.

7.7 Merchant has filed or caused to be filed any and all federal, state, local and foreign tax returns which are required to be filed, and has paid or caused to be paid any and all taxes as shown on such returns or on any assessment received by Merchant to the extent that such taxes have become due, and Merchant has no knowledge of any material liability for any tax to be imposed on Merchant or any of its assets or properties for which adequate provision has not been made in its financial statements.

7.8 Each Purchased Receivable constitutes a legal, valid and binding obligation of the debtor. No sale of a Purchased Receivable will constitute a fraudulent transfer or a fraudulent conveyance or will otherwise be void or voidable under similar laws or principles, the doctrine of equitable subordination, laws regarding preferential transfers, or for any other reason.

7.9 Any and all representations made in this Agreement, and any and all financial statements delivered to the Company, are true and correct, and no material fact has been omitted.

7.10 No portion of Merchant's Receivables, or any other assets pledged pursuant to Section 9 hereof, is subject to any lien, security interest, assignment, option or encumbrance, other than the security

      interest(s) granted to the Company, the credit card processor(s), and/or their member banks. There has been no material, adverse changes in Merchant's business, nor does Merchant have knowledge of any event that may occur in the future that could negatively impact Merchant's business.

7.11    Each and all of the foregoing covenants, representations and warranties shall be deemed to be continuing covenants, representations and warranties of Merchant and shall remain true and accurate at all times after the date of this Agreement, until the Purchased Receivables have been paid in full.

7.12    Merchant is responsible for providing information related to changes in its Receivable Value.

**8. Timing and Method of Funding**

8.1    Merchant and the Company agree that the Company shall Purchase Receivables on a date to be determined by the Company, at its sole discretion, (the "Purchase Date"). Merchant and the Company also agree that the Company, at its sole discretion, may refuse to purchase the Purchased Receivables for any or no reason. Merchant and the Company further agree that the Company shall provide payment through any commercially reasonable method, at the Company's sole discretion, including, but not limited to, check, federal funds wire, or ACH transfer.

**9. Grant of Security Interest**

9.1    To secure performance of Merchant's obligations hereunder, and subject to all contractual and common law rights of, and the security interests granted in favor of, the Merchant's bank(s), credit card processor(s) and their member banks in or related to the Processor Agreement, Merchant grants to the Company a continuing security interest in the following:

    (a)    all of Merchant's accounts, chattel paper, goods, inventory, equipment, instruments, reserves, reserve accounts, investment property (if any), documents, general intangibles, as such terms are defined in the UCC, as revised and in effect;

    (b)    all Future Receivables, as herein defined;

    (c)    all other assets and personal property of Merchant; and

    (d)    all products and proceeds thereof.

The company shall have all rights and be entitled to all benefits afforded to a secured creditor under the UCC, or otherwise at law. Merchant hereby authorizes the Company to file and/or record such further instruments, agreements or undertakings, and such certificates of title, financing and continuation statements, and other instruments, as the Secured Party may deem necessary or desirable to perfect, protect and preserve the security interests hereby granted in the Collateral. Nothing contained in this Section 8 shall be construed to change the parties' intent under this Agreement to affect a final sale of the Purchased Receivables, as opposed to a secured loan or any other type of transaction.

**10. Termination**

10.1    This Agreement shall be terminated, at the Company's sole discretion, in the event of any of the following:

    (a)    Merchant materially breaches any term or provision of the Processor Agreement and/or this Agreement;

    (b)    Merchant is found to have made a materially false or incorrect representation, warranty or statement;

    (c)    the Company shall fail to have valid and unencumbered ownership in and to the Purchased Receivables; or

    (d)    there is any materially adverse change in Merchant's operation, or any other event which materially affects Merchant's ability to perform its obligations hereunder.

10.2    In the event of termination of this Agreement, the Company shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided by the UCC.

**11.    Waiver**

11.1    The Company's failure to exercise any right under this Agreement does not constitute a waiver on the Company's part to exercise such rights at a later time. Nor shall any singular or partial exercise of any right under this Agreement preclude the Company from any other future exercise of any right.

11.2    The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**12.    Binding Effect**

12.1    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs and assigns.

**13.    Costs and Expenses**

13.1    In addition to any other remedies available to it, the Company shall be entitled to recover from Merchant any and all reasonable costs and attorney's fees associated with and/or resulting from the enforcement of its rights and remedies hereunder or at law or equity. Any payments pursuant to the foregoing shall include all foregoing costs and expenses, as well as interest thereon at a rate of 3% percent (3%) per month (or, if less, such rate as is the highest legally permissible rate) from the date the obligation is due until all such amounts are paid.

**14.    Survival and Further Assurances**

14.1    All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force and effect until such time as all obligations under this Agreement have been satisfied.

14.2    Merchant agrees, from time to time, upon the Company's request, to make, execute, acknowledge, and deliver to the Company such further and additional instruments, documents, and agreements, and to take such further action as may be required to carry out the intent and purpose of this Agreement.

**15.    Jury Trial**

15.1    The parties hereby waive trial by jury in any court presiding over any suit, action or proceeding arising under this Agreement, unless such waiver is prohibited by law. The parties acknowledge that this waiver is made knowingly and voluntarily. The parties have been given ample time and opportunity to seek advice of counsel prior to the execution of this Agreement.

**16.    Counterparts and Reproductions**

16.1    This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one instrument. Facsimile copies of signatures to this

        Agreement shall be deemed to be originals, and the parties may rely upon such facsimile copies to the same extent as the originals.

**17.**    **Entire Agreement**

17.1    This Agreement contains the entire understanding of the parties hereto and supersedes all prior negotiations, whether oral or written.

**18.**    **Severability**

18.1    Should any term or provision of this Agreement be deemed invalid, illegal or unenforceable, then such invalid, illegal or unenforceable term or provision shall be null and void, and all other terms and provisions of this Agreement shall continue in full force and effect as though such invalid, illegal or unenforceable term or provision had never been a part hereof.

**19.**    **Governing Law**

19.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**20.**    **Ratification**

20.1    This Agreement shall not constitute a contract until fully executed by all parties hereto.

**EXHIBIT 1**

This Exhibit sets forth the terms of that certain Merchant Invoice Purchase Agreement, dated as of  November 17, 2020 and FEBRUARY 12, 2020 and revised and providing additional funding on or about February 24 2021, between McGraw Capital Partners, LLC (the "Company"), and   SAFE HARVEST MEDICAL, LLC      (the "Merchant"), where the profits, net of expenses, are split as follows:

    50% of profits, net of expenses to the Company as Lead, and to Participants, pro-rated, on capital contributed.
    40% of profits, net of expenses to the Merchant
     5% of profits, net of expenses to Sunstrider, as intermediary fee
     5% of profits, net of expenses to Company, as intermediary fee

The Merchant will effectuate repayment of all capital contributed by the Company as and when repayment is received. After the Merchant fully repays the Company's capital, plus the agreed upon pro-rata annual return to the Company, the Merchant shall disburse the remaining funds as per the rates of participation above (50%, 40%, 5% and 5%) to the Company and Sunstrider. Repayment will be made within two (2) business days of receipt of funds from customers.

Merchant shall provide the Company with full visibility into the costs and details of the transaction, including, but not limited to:

    - Exact quantity of product
    - Glove specifications being produced and sold
    - Any supporting documentation from the factory and end buyers
    - Completion Documents or Bill of Lading
    - SGS or similar entity's inspection documents
    - Such other documentation as is reasonably necessary in order for the Company to assess the costs and details of the transaction

Merchant represents and warrants that the following information provided by it to the Company is true, accurate and complete, to the best of Merchant's knowledge:

**EXHIBIT 1 (CONTINUED)**

| | A | B | C |
|---|---|---|---|
| 1 | **Safe Harvest PPE Model - SkyMed** | | |
| 2 | | | |
| 3 | Sales Price | | $16.000 |
| 4 | Number of Boxes | | 230,000 |
| 5 | Total Sales Price | | $3,680,000.00 |
| 6 | **Expenses** | | |
| 7 | Manufacturing | $9.15 | $2,104,500.00 |
| 8 | Import Fees | | $0.00 |
| 9 | Warehousing & Processing | $0.80 | $184,000.00 |
| 10 | Land Freight | $0.65 | $149,500.00 |
| 11 | Air Freight | | |
| 12 | Ocean Freight | $0.00 | $0.00 |
| 13 | Virtus | $0.25 | $57,500.00 |
| 14 | Pre-fees Expenses | $2,495,500.00 | |
| 15 | + McGraw Fee | $2,545,410.00 | |
| 16 | =+ Intermediary fee | $113,459.00 | |
| 17 | Net profit | $1,021,131.00 | |
| 18 | **Profit Breakdown** | | |
| 19 | Investor share | 50% | $510,565.50 |
| 20 | Investor A | 0% | $0.00 |
| 21 | Investor B | 0% | $0.00 |
| 22 | Investor C | 0% | $0.00 |
| 23 | Investor D | 0% | $0.00 |
| 24 | Safe Harvest Medical Share | 50% | $510,565.50 |
| 25 | Safe Harvest Med Sales | $0.35 | $80,500.00 |
| 26 | Net to SHM | | $430,065.50 |
| 27 | McGraw fee | 2.00% | $49,910.00 |
| 31 | | Monies in (Mcgraw Syndicate): | $ 2,500,000.00 |
| 32 | | Net Profit | $1,021,131.00 |
| 33 | | SHM share | $510,565.50 |
| 34 | | McGraw Share w Syndicate | $ 3,010,565.50 |
| 35 | | McGraw fee 2% of investment | $49,910.00 |
| 36 | | McGraw Intermediary fee 5% of net profit | $56,729.50 |
| 37 | | Total Due to McGraw | $ 3,117,205.00 |

**Applicant**

Safe Harvest Medical, LLC

By: *[signature]*

Name:  Garrett E. Mann
Title:  CEO

**Co-Applicant**

Safe Harvest Medical, LLC

By: *[signature]*

Name: Jason Tomlinson
Title:  Vice President

**MCGRAW CAPITAL PARTNERS**

By:

**Name:  John Kozey**
**Title:  COO**

## APPENDIX A - FEE STRUCTURE

A.  **Underwriting Fee: up to 4% of funded amount** (to cover underwriting and related expenses).
B.  **Change of Bank Fee**: **$250.00.**
C.  **Bank Wire Fee: $50.00.**
D.  **Insufficient Funds Fee: $55.00 each occurrence** (up to four occurrences before a default is declared).
E.  **Unauthorized Account Fee: $1,000.00** (if a merchant blocks our ACH debit of the Account, bounces more than 4 debits of the Account, or simultaneously uses multiple bank accounts or credit card processors to process its receipts).
F.  **Default Fee: $2,500.00** (if a merchant changes bank accounts or switches to another credit-card processor without McGraw's consent, or commits another default pursuant to the Agreement).
G.  **Miscellaneous Service Fees:** Merchant shall pay certain fees for services related to the origination and maintenance of accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fedwire or $100.00 for a bank ACH.
H.  **Report Request: $80**
I.  **UCC Filing Fee: $195.00**

| Applicant | Co-Applicant |
|---|---|
| Safe Harvest Medical, LLC | Safe Harvest Medical, LLC |
| By: *[signature]* | By: *[signature]* |
| Name: Garrett E. Mann | Name: Jason Tomlinson |
| Title: CEO | Title: Vice President |

# PERSONAL GUARANTY OF PERFORMANCE

I/We, ___Garret E. Mann and Jason Tomlinson_____ (the "Guarantor(s)"), have reviewed and agree to the terms and conditions of the Merchant Invoice Purchase Agreement and this Guaranty, and all representations made therein and herein by Merchant and Guarantor(s) are true and correct.

The undersigned Guarantor(s) hereby guarantees Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of

creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts.

In the event that Merchant fails to deliver the receivables purchased hereunder or perform any obligation when due under the Merchant Agreement, Company may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross- Collateral Company may hold pursuant to this Agreement or any other guaranty. Company does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to timely perform any obligation under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) Company's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to Company. In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to Company; (ii) release Merchant from its obligations to Company; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to Company under the Merchant Agreement and this Agreement are satisfied in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement, Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Company must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

The Guarantor(s) agree to conduct, and cause Merchant to conduct, business in the ordinary course and in substantially the same manner as heretofore conducted and use commercially reasonable efforts not to commit any act that results in a material reduction of Merchant's credit card transaction volume. The Guarantor(s) further agree not to permit, or allow Merchant to permit, any event to occur that could cause a diversion of any of Merchant's credit card transactions from its current credit card processor(s) to any other entity, and Guarantor(s) shall not, except as otherwise required by the Processor Agreement, dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any business assets of Merchant without the prior written consent of the Company, which may be withheld for any reason, until the Company receives the entire Specified Amount.

By signing this Guaranty, the Guarantor(s) assume and guaranty all of Merchant's obligations under the Merchant Cash Advance Agreement, including, but not limited to, the obligation of Merchant to indemnify the Company and Merchant's credit card processor(s) and related member banks, pursuant to Section 5 thereof. To induce the Company to accept Merchant's application and to enter into the Merchant Cash Advance Agreement, the Guarantor(s) hereby agree to pay any and all costs and attorneys' fees in connection with any action commenced by the Company, the credit card processor(s) or their member banks to enforce their rights under the Merchant Cash Advance Agreement and/or this Guaranty.

This Guaranty is unlimited, absolute and without condition, and is binding upon the Guarantor(s), his/her/their heirs, legal representatives, successors and assigns. The Guarantor(s) waive any and all rights to require the Company or any other Indemnitee to proceed against Merchant before taking action against him/her/them.

Any legal action, suit or proceeding arising from the Merchant Invoice Purchase Agreement or this Guaranty, or the transactions contemplated hereby or thereby, may be instituted in any state or federal court of competent subject matter jurisdiction in the State of New York. The Guarantor(s) hereby knowingly and voluntarily consent to personal jurisdiction in the courts of the State of New York with respect to any such legal action, suit or proceeding. The Guarantor(s) hereby irrevocably consent to the service of process in any of the aforementioned courts in any such action, suit or proceeding by certified US Mail, postage prepaid, to him/her/them at the address(es) set forth below. The Guarantor(s) knowingly and voluntarily waive any claim or defense in any action, suit or proceeding commenced in the New York State Court or the United States District Court for the District of Northern New York, asserting that he/she/they is/are not subject personally to the jurisdiction of such court, that service upon him/her/them as hereinabove set forth is invalid, that his/her/their property is immune or exempt form attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that the Merchant Cash Advance Agreement or this Guaranty, or the subject matter hereof, may not be enforced in or by such court.

If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several.

**The Guarantor(s) acknowledge having read the terms of the Merchant Invoice Purchase Agreement and this Guaranty, and his/her/their signature(s) below shall serve as confirmation that he/she/they understand(s) all of the terms and provisions of the Merchant Invoice Purchase Agreement and this Guaranty. The Guarantor(s) acknowledge receiving a copy of the Merchant Invoice Purchase Agreement, that he/she/they has/have had the opportunity to review the Merchant Invoice Purchase Agreement and this Guaranty with counsel of his/her/their choice, and that he/she/they receive(s) substantial benefits as a result of the Merchant Invoice Purchase Agreement.**

**GUARANTOR(S):**

| Signature | Signature |
|---|---|
| Garrett E. Mann | Jason Tomlinson |
| Print Name | Print Name |
| 1201 S. 1st., McAalen, TX 78501 | 2619 Senate St. Columbia, SC 29205 |
| Address | Home Address |
| 2/25/2021 | 2/25/21 |
| Date | Date |

# ANTI-FRAUD GUARANTY

I/We, \_\_\_\_\_Garret E. Mann and Jason Tomlinson_____ _____, (the "Guarantor(s)"), have reviewed and agree to the terms and conditions of the Merchant Invoice Purchase Agreement and this Fraud Guaranty, and all representations made therein and herein by Merchant and Guarantor(s) are true and correct.

The Guarantor(s) agree to conduct, and cause Merchant to conduct, business in the ordinary course and in substantially the same manner as heretofore conducted and use commercially reasonable efforts not to commit any act that results in a material reduction of Merchant's credit card transaction volume. The Guarantor(s) further agree not to permit, or allow Merchant to permit, any event to occur that could cause a diversion of any of Merchant's credit card transactions from its current credit card processor(s) to any other entity, and Guarantor(s) shall not, except as otherwise required by the Processor Agreement, dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any business assets of Merchant without the prior written consent of the Company, which may be withheld for any reason, until the Company receives the entire Specified Amount.

By signing this fraud Guaranty, the Guarantor(s) assume and guaranty all of Merchant's obligations under the Merchant Cash Advance Agreement, including, but not limited to, the obligation of Merchant to indemnify the Company and Merchant's credit card processor(s) and related member banks, pursuant to Section 5 thereof. To induce the Company to accept Merchant's application and to enter into the Merchant Cash Advance Agreement, the Guarantor(s) hereby agree to pay any and all costs and attorneys' fees in connection with any action commenced by the Company, the credit card processor(s) or their member banks to enforce their rights under the Merchant Cash Advance Agreement and/or this Fraud Guaranty.

This Guaranty is unlimited, absolute and without condition, and is binding upon the Guarantor(s), his/her/their heirs, legal representatives, successors and assigns. The Guarantor(s) waive any and all rights to require the Company or any other Indemnitee to proceed against Merchant before taking action against him/her/them.

Any legal action, suit or proceeding arising from the Merchant Invoice Purchase Agreement or this Fraud Guaranty, or the transactions contemplated hereby or thereby, may be instituted in any state or federal court of competent subject matter jurisdiction in the State of Illinois. The Guarantor(s) hereby knowingly and voluntarily consent to personal jurisdiction in the courts of the State of Illinois with respect to any such legal action, suit or proceeding. The Guarantor(s) hereby irrevocably consent to the service of process in any of the aforementioned courts in any such action, suit or proceeding by certified US Mail, postage prepaid, to him/her/them at the address(es) set forth below. The Guarantor(s) knowingly and voluntarily waive any claim or defense in any action, suit or proceeding commenced in the Illinois State Court or the United States District Court for the District of Northern Illinois, asserting that he/she/they is/are not subject personally to the jurisdiction of such court, that service upon him/her/them as hereinabove set forth is invalid, that his/her/their property is immune or exempt form attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that the Merchant Cash Advance Agreement or this Fraud Guaranty, or the subject matter hereof, may not be enforced in or by such court.

If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several.

Case: 1:22-cv-01363 Document #: 1-2 Filed: 03/15/22 Page 15 of 15 PageID #:59

- 15 -

The Guarantor(s) acknowledge having read the terms of the Merchant Invoice Purchase Agreement and this Fraud Guaranty, and his/her/their signature(s) below shall serve as confirmation that he/she/they understand(s) all of the terms and provisions of the Merchant Invoice Purchase Agreement and this Fraud Guaranty. The Guarantor(s) acknowledge receiving a copy of the Merchant Invoice Purchase Agreement, that he/she/they has/have had the opportunity to review the Merchant Invoice Purchase Agreement and this Fraud Guaranty with counsel of his/her/their choice, and that he/she/they receive(s) substantial benefits as a result of the Merchant Invoice Purchase Agreement.

**GUARANTOR(S):**

| | |
|---|---|
| *[signature]* | *[signature]* |
| Signature | Signature |
| Garrett E. Mann | Jason Tomlinson |
| Print Name | Print Name |
| 1201 S. 1st St., McAllen, TX 78501 | 2619 Senate St. Columbia, SC 29205 |
| Address | Address |
| 2/25/2021 | 2/25/21 |
| Date | Date |